SHIPMAN v. FRANK et al.

(District Court, D. Maryland. September 11, 1916. Rehearing Denied January 3, 1917.)

1. PATENTS ☞124—VALIDITY—FRAUD IN PROCURING.

Where, though a prior patent was cited against some of plaintiff's claims, plaintiff proceeded and secured a patent including other claims, the fact that he subsequently applied for a reissued patent, on the theory that in view of the disclosures of the prior patent another of his original claims

———

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

was too broad, does not establish fraud in securing the patent, though plaintiff doubtless read the prior patent; for actual fraud must be proven, and it cannot be assumed that plaintiff saw the interference which was not discovered by the Patent Office examiner.

[Ed. Note.—For other cases, see Patents, Cent. Dig. § 176; Dec. Dig. ⊙⟶124.]

2. PATENTS ⊙⟶138(1)—REISSUED PATENTS—LACHES IN SEEKING.

Though plaintiff's original patent was issued in 1905 on an application filed in 1904 and he did not until 1915 apply for a reissued patent, on the ground that one of his claims was too broad, the reissued patent will not be held invalid on the ground of laches in seeking a reissue, notwithstanding about nine months before application therefor defendant's attorney advised plaintiff that his broad claim was anticipated; for, while a patentee must use reasonable diligence in seeking a reissue, yet knowledge that a claim is too broad is necessary before action is required, and plaintiff was not bound to accept the statement of defendant's attorney made in negotiations for the disposal of his patent.

[Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 201, 201½, 203; Dec. Dig. ⊙⟶138(1).]

3. PATENTS ⊙⟶62—VALIDITY—ANTICIPATION. .

A patent will not be held invalid on the ground of anticipation, where the evidence was sufficient only to raise a doubt as to whether the patentee's invention was anticipated.

[Ed. Note.—For other cases, see Patents, Cent. Dig. § 78; Dec. Dig. ⊙⟶62.]

4. PATENTS ⊙⟶157(1)—CLAIMS—CONSTRUCTION.

Where a patent by reason of slight use, notwithstanding appreciable advertisement, appears to have been of little practical value, it is not entitled to a broad construction.

[Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 229, 230; Dec. Dig. ⊙⟶157(1).]

5. PATENTS ⊙⟶328—VALIDITY—INFRINGEMENT.

The Shipman patent, No. 783,902, of February 28, 1905, and reissued patent No. 13,903, of April 20, 1915, for a carbureter, *held* limited to a device where the closing movement of the valve was retarded by a dash pot, and, as limited, not infringed by defendant.

In Equity. Bill by Ralph Shipman against Joseph Frank and Sidney Frank, trading as Frank Bros. Bill dismissed.

John Watson, Jr., of Baltimore, Md., and Robert Watson, of Washington, D. C., for plaintiff.

John E. Cross, of Baltimore, Md., Charles W. Hills and Charles W. Hills, Jr., both of Chicago, Ill., and Edwin F. Samuels, of Baltimore, Md., for defendants.

ROSE, District Judge. Plaintiff says defendants have sold a carbureter which infringes the fifteenth claim of his reissued patent 13,903, granted April 20, 1915. The defendants are Baltimore dealers in automobile supplies. The carbureter was made by Findeisen & Kropf Manufacturing Company, an Illinois corporation. It has a great interest in the controversy, the nominal defendants scarcely any. It has come into the case and taken charge of the defense. For convenience it will be called the "defendant."

⊙⟶For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

The original patent was numbered 783,902. It was issued February 28, 1905, in pursuance of an application filed January 8, 1904.

### The Defenses.

The defenses are invalidity and noninfringement. To sustain the former, four grounds are assigned: (1) Fraud in procuring the original issue. (2) Laches in asking for the reissue.' (3) Prior use by one Menns. (4) Anticipation by various British and American patents. Of these in their order.

### Fraud in Procuring the Grant of Original Claim 15.

[1] In asking for the reissue, plaintiff said that in the light of the disclosures of the Butler patent, 423,214, the original claim 15 was too broad. In the course of the prosecution of the original application, this Butler patent was cited against other of plaintiff's claims. It was not mentioned in connection with claim 15. Defendant points out that nevertheless at that time plaintiff's attention was called to it. He must have read it. If he did, it is argued he must have perceived that claim 15 covered much to which he had no right. To persist in his application for it was, it is contended, knowingly to seek a patent for more than he had invented. Actual fraud must ordinarily, perhaps must invariably, be shown before a patent can be held void on this ground. The examiner in the Patent Office had the Butler patent before him. He did not discover its pertinency to claim 15. Plaintiff may have been equally honest and equally dull.

### Laches in Seeking a Reissue.

[2] The reissued patent differs from its original in the wording of the claim in suit. In all other respects they are identical. The change in the phraseology of that claim has no other effect than to narrow its scope. Nevertheless, it is said that plaintiff waited too long to ask for it. He did not make his application for the reissue until March 15, 1915, more than ten years after the patent was granted. Mere lapse of time after the issue of a patent does not by and of itself bar the right to disclaim or to obtain a strictly narrowing reissue. A patentee, it is true, must act with reasonable promptness after he knows that his patent or some of its claims are too broad; but knowledge must precede action, and, until he knows that his claim covers something he has not invented, he is not bound to do anything. He is not required to believe everybody who tells him that his claim is invalid. Very possibly, as defendant contends, a patentee even before he knows his grant is too broad may so act as to shut off his right to disclaim or to seek a narrowing reissue. It would be unsafe to say that there are no circumstances in which such an estoppel would be raised. Into such questions there is no occasion here to go. In this case nothing is shown which even tends to make it inequitable for plaintiff to stand upon the reissue he has obtained. It is true that about 9½ months before the application for the reissue was filed 'defendant's lawyer told the plaintiff that claim 15 was anticipated by the Butler patent. This statement was true, but plaintiff was not bound to believe it.

Defendant was then in treaty with him for the purchase of his patent, or, at all events, had been in such treaty a few days before. He may have thought what was said as to the worthlessness of claim 15 was merely the proverbial, "It is naught," of the would-be buyer.

### Prior Use by Menns.

[3] The defendant has produced a carbureter made by one Menns. It embodies the invention described in the claim in suit. The controversy is as to whether it was made before or after plaintiff applied for his patent. Much evidence has been taken concerning it, and a good deal of heat has been generated in the process. A minute analysis of the testimony relating to it would serve no purpose. The conclusion would be merely that it is doubtful whether Menns made his device before or after plaintiff asked for his patent. Under such a state of the proofs, this particular defense fails.

### Anticipation by Prior British and American Patents.

[4] A number of patents have been offered in evidence. Highly competent experts have discussed them from many different points of view. The defendant has had constructed devices which its experts say embody the inventions shown in these patents. As is usual, the witnesses for the defendant assert that, when they have done anything not alluded to in the patent or not precisely therein described, they have used only the skill and discretion which the patentee had the right to expect from the mechanic who undertook to reduce his invention to practice. Equally according to established custom and usage, plaintiff's expert replies that what has been done is to reconstruct the various patented machines, not as the inventors intended them to be, but in the light of subsequent discoveries. No discussion of any of these patents or of what has been said about them will be attempted. I am not satisfied that the precise combination described in the claim at bar is to be found in any of them. I am not prepared to say that there may not have been invention in combining the old elements as plaintiff did. It is true that, individually considered, each of these elements was old, and that others had previously brought them, or some of them, together in ways which were not much unlike that of the plaintiff. For a number of years after plaintiff's patent was issued, little use was made of the combination covered by the claim in suit, although plaintiff gave it an appreciable advertisement. It is therefore possible that the forward step in the art taken by plaintiff was, after all, of but little practical value. Under such circumstances, the claim is not entitled to a broad construction.

### Noninfringement.

[5] Has the defendant infringed? The answer turns on a narrow issue. Prof. Carpenter, of Cornell, who was defendant's principal expert, pointed out that there are ten elements in the combination described in the claim in suit. He finds all but one in defendant's device. The one which he thinks is missing is described in the claim itself as means for retarding the closing movement of a valve, which in both

defendant's and plaintiff's structures normally restricts the flow of air through the mixing chamber and is adapted to open by atmospheric pressure. The means actually used by the plaintiff to effect this retardation was a dash pot. The use of such an instrumentality to check too rapid movement was old in this and in other arts. Defendant has a dash pot. In defendant's, as in plaintiff's device, the dash pot affects the speed of the valve movement, which, were it not for the dash pot, would close more quickly than it does. Plaintiff's claim may therefore be read upon defendant's structure. It must be, provided the words used are to be understood as they would be by one who knew nothing of how they got into the claim. But they actually have a history, and one which for the purpose in hand is significant. The patent has always said that it is desirable to permit the valve to open rather freely and to retard the closing movement in order to avoid hammering against its stop. The mechanical construction of plaintiff's valve was such that some means to prevent hammering was necessary. It was called for entirely independently of any direct effect hammering would have upon the operation of the engine itself. Had it not been supplied, the parts would have been worn out so speedily that the device would have been of no practical value. Nothing else is said as to the purpose of the retardation, except that it prevents any sudden closure of the valve when there is no demand for air.

While the descriptive portions of the patent thus explained that the purpose of the retarding device was to prevent hammering resulting from too sudden closing and that this end was to be reached by retarding the closing of the valve, the original fifteenth claim was not so limited. In it the retarding element was described as "means for retarding the movement of the valve in question," comprising a "cylinder containing a liquid"; that is, as the context shows, a dash pot. The claim literally construed would have covered all carbureters containing the other elements of the described combination and in which a dash pot retarded the movement of the valve in either or in both directions. Plaintiff himself ultimately reached the conclusion that in view of the prior art a claim of such breadth could not be sustained. In his oath supporting his application for the reissue he said, among other things, that in the Butler patent there is shown a pump plunger in a cylinder in a fuel reservoir for pumping fuel into a mixing chamber, and that such cylinder, liquid, and piston necessarily cause some retardation of the movement of the valve, although such retardation is incidental and without functional purpose. In connection with the limitation introduced into the reissued claim that the retardation must be to the closing movement of the valve, this disclaimer necessarily requires that the claim shall be so construed as to exclude from it any structure in which there is a retardation even to closing, provided such retardation is not intended to serve any purpose of its own, and is merely incidental to the attainment of some other end.

Plaintiff says, even so, defendant infringes, because in his view the retardation to the closing of defendant's valve is intended to prevent its fluttering and actually achieves that purpose. Defendant

replies that it does not seek to make the closing of the valve a slow process or slower than it otherwise would be. Its aim as defined by itself and its experts is to insure that the valve shall open rather slowly, or that it shall secure a certain pumping action in its machine, which pumping action requires the introduction of a resistance to the opening of the valve. If there is any resulting retardation to the closing, it is a mere purposeless incident. In defendant's structure there is little or no occasion to guard against the valve hammering upon its stop, if the word "hammering" is to be understood in its most literal sense. Plaintiff nevertheless argues that the retardation of the closing movement of the valve helps to prevent fluttering, any tendency to which makes a carbureter undesirable. A properly constructed and adjusted dash pot will do much to prevent fluttering precisely as it has long been used to keep doors from slamming. A dash pot which retards the movement of a valve in one direction may, and ordinarily perhaps will, make slower the corresponding movement in the other. In this case the dispute is all the more attenuated and difficult to follow because in modern high-speed multiple-cylinder engines there is little fluttering, so long as they are running at a constant speed. Everything is being done so rapidly that the valve has not time to change its position. It remains permanently open, in what is, for practical purposes, a fixed position. Fluttering takes place only when a sudden change of speed is made or attempted. As appears from the admissions of the plaintiff and his expert under cross-examination, a carbureter in which the closing of the valve is retarded under such circumstances has certain disadvantages which occasionally might conceivably prove serious.

The issue between the parties as to infringement vel non is both narrow and close. I am not convinced, however, that defendant's carbureter contains any element which is intended to retard the closing of the air valve or in which any function is accomplished by any retardation to closing which may, incidentally to the operation of the machine in other respects, take place.

It follows that, although the claim in suit is valid, defendants have not infringed it. The bill will be dismissed.