PARKE–DAVIS & CO. v. H. K. MULFORD & CO. (two cases).

(Circuit Court of Appeals, Second Circuit. April 22, 1912.)

Nos. 182, 183.

1. PATENTS (§ 328*)—VALIDITY AND INFRINGEMENT—ADRENALIN.

The Takamine patent, No. 730,176, for a glandular extractive product commercially known as "adrenalin," claim 1, which covers "a substance possessing the herein described physiological characteristics and reactions of the suprarenal glands in a stable and concentrated form and practically free from inert and associated gland tissue," as well as claims 2, 9, 11, 12, and 14, all of which contain a reference to "associated gland tissue," construed in the light of the specification, must be limited to a substance possessing the described characteristics and reactions the constituents of which, or some of them, were at one time associated with suprarenal gland tissue. As so construed, all of said group of claims *held* valid and infringed. Claims 6, 13, and 15, which do not contain such limitation, not passed upon.

2. PATENTS (§ 328*)—VALIDITY AND INFRINGEMENT—SALT OF ADRENALIN.

The Takamine patent, No. 753,177, for a glandular extractive compound which deals with a salt of the product covered by the Takamine patent, No. 730,176, claims 5 and 6, which are expressly limited to a compound of an acid and "the herein described product of the suprarenal glands," *held* valid and infringed. Claims 1 and 2, which are without such limitation, not passed upon.

Appeals from the Circuit Court of the United States for the Southern District of New York.

Two suits in equity by Parke-Davis & Co. against H. K. Mulford & Co. Decree for complainant, and defendant appeals. Reversed in part in each case.

For opinion below, see 189 Fed. 95.

This cause comes here upon appeals from two decrees of the Circuit Court, Southern District of New York. Two suits instituted by appellees for alleged infringement of letters patent were heard in that court and presented here upon one record. In the first case defendant is charged with infringement of patent No. 730,176, dated June 2, 1903, to Jokichi Takamine for glandular extractive product, and the other case charges infringement of patent No. 753,177 to the same patentee, dated February 23, 1904, for glandular extractive compound. Complainant's commercial products are known, respectively, as

"Adrenalin" and "Adrenalin solution": defendant's product is known as "Adrin," either dry or in solution in acidified water.

In the first suit the Circuit Court held that patent 730,176 was good and valid as to claims 1, 2, 6, 9, 11, 12, 13, 14, and 15 and that defendant had infringed these claims. In the second suit the Circuit Court held that patent 753,177 was good and valid as to claims 1, 2, 5, and 6 and that defendant had infringed these claims. Upon an adverse decision as to claims 3 and 4 the complainant filed a disclaimer, and these two claims are not here considered.

Charles Howson, for appellant.

Livingston Gifford, for appellee.

Before LACOMBE, WARD, and NOYES, Circuit Judges.

LACOMBE, Circuit Judge (after stating the facts as above). Judge Hand's opinion is most exhaustive. The specifications, the claims, the prior art, the difficult chemical questions presented, and the nature of complainant's and defendant's products are all set forth fully and with the greatest clearness. All the arguments which have been presented to us are carefully discussed. It will be sufficient to refer to that opinion for all these details, and to indicate here merely the few subjects on which we have reached a different conclusion. Upon all the main fundamental questions we fully concur in Judge Hand's reasoning and conclusions.

Before the patentee's appearance in the field, it had been discovered that the suprarenal glands of certain animals, when dried and powdered or in aqueous solution, possessed hemostatic, blood pressure raising and astringent properties which indicated that they might be utilized in medical, surgical, and other arts. They were so used, but for various reasons which are fully set forth in Judge Hand's opinion, they were most unsatisfactory. It was important, if possible, to ascertain what it was in these glands which possessed these physiological properties, whether it was a "principle" or a "condition," and if it were a "principle" to isolate it from its environment with other principles so as to obtain it in a stable, pure, and concentrated form, efficient and constant in action, and which could be used without danger of bringing deleterious and injurious bodies into contact with or introducing such bodies into the patient's system. This Takamine did, and by a process, which is the subject of another patent not here in suit, he produced a substance, a chemical compound—in the form both of a base and of a salt—possessing the physiological characteristics of the glands and in the practically pure and stable form which was desired. We are satisfied that his invention—this product—was a highly meritorious one and that it is covered by his patents.

[1] Upon the question of infringement of the first patent we find it desirable, for reasons hereinafter stated, to discuss some of the claims.

The first one reads as follows:

"1. A substance possessing the herein-described physiological characteristics and reactions of the suprarenal glands in a stable and concentrated form, and practically free from inert and associated gland tissue."

Is this claim confined to a product which has been isolated from the suprarenal glands, or does it cover broadly a chemical compound pro-

duced wholly irrespective of those glands and possessing the indicated characteristics and reactions? Judge Hand apparently gave it the broader construction, but we think the language of the claim will not permit of such interpretation. It states that the substance is "practically free from * * * associated gland tissue." The idea of freedom from *associated* gland tissue seems to import that, except for the circumstance that such freedom had been brought about, the substance would have remained associated with gland tissue. The claim therefore should, we think, be restricted to a substance in whose production the suprarenal glands (whose physiological characteristics were already known) have played some part. But this narrower construction of the first claim does not result in relieving defendant from the charge of infringing it. Its product is also a substance, possessing the indicated characteristics, and the constituents of which, or some of them, were at one time associated with suprarenal gland tissue.

Defendant has argued at great length that its product contains many times the quantity of inert inorganic matter which is found in the product of the patent. It construes the words "practically free from inert and associated gland tissue" as calling for a practical freedom from "inert" inorganic matter, as well as "inert" organic matter. Reference to the specifications makes the meaning of this clause clear. The patentee there states that the difficulty with the crude earlier preparations of dried and powdered glands, or aqueous solution thereof, was that they were not "free from injurious and decomposing ingredients." He further states that his invention renders the desirable properties of the glands available for use in a form which is "without danger of bringing deleterious and injurious bodies into contact with or introducing such bodies into the patient's system." He describes a process at considerable length and of the product of such process says, "This constitutes the product of my invention." This, however, he states contains mineral matters and other impurities and inert substances, inorganic matter, which *may,* he says, be removed (by precipitation, etc.), thus further purifying the substance which is his invention. The first claim, therefore, fairly covers the substance which he says is the invention, a substance practically free from inert organic matter, even though it has not been subjected to the further optional treatment to free it practically also from inert inorganic matter. Thus to construe the claim does not involve reading into it words which the patentee has not inserted. The words "inert gland tissue" are ambiguous; they may mean gland tissue which is organic, or which is inorganic, or both. It is quite in accord with well-recognized canons of construction to turn to the specifications to see if they will remove all doubt as to the sense in which the words of the claim are used. In our opinion they do so in this case, and defendant's dry product is an infringement of this claim.

There are in the first patent 16 separate claims. The patentee had invented a single product possessing certain characteristics and reactions; in order to be sure so to express himself that his claim might not fall short of his invention, he undertook to identify his product in varying forms of words. When such a patent comes before a court

in a suit against some particular infringer, and it is found that one valid claim is sufficient to cover the particular infringement, and all possible variations of it accomplished by colorable modifications, it is not always necessary to discuss other claims of the patent, which complainant may insist equally cover the infringement.

The claims, other than first, now before us may be divided into two groups. The first group comprises claims, which enumerate one or other of the various reactions or characteristics set forth in the specifications and which are all included in the broader language of the first claim. Such is the second claim, which differs from the first claim only in stating that the "substance" has "a whitish color when in a dry or solid condition." All the claims of this group, however (Nos. 2, 9, 11, 12, and 14), contain, as does the first claim, the phrase "practically free from * * * associated gland tissue." This phrase, as has been seen, we construe as importing that the product, or one or more of its constituents, was at some time associated with gland tissue of the suprarenal glands. As thus construed, we concur with Judge Hand in the conclusion that all of them are valid and that defendant's product infringes them all.

The second group of claims comprises the sixth, thirteenth, and fifteenth. None of these contain any reference to associated gland tissue. It is sufficient to quote the sixth:

"6. A crystalline substance possessing the herein-described physiological characteristics and reactions of the suprarenal glands, said substance having the property of crystallizing in a variety of forms."

By reason of the absence of the words "associated gland tissue," the text of this claim does not restrict it to a substance in the production of which the suprarenal glands have played some part. Considered by itself, without referring to the specifications or the prior art, it is a very broad claim. Should some one hereafter discover that in the bones or scales of certain fish or in the root of some shrub there was a principle possessing all the physiological characteristics of the suprarenal glands, and should this discoverer, by some process wholly unlike Takamine's isolate that principle in the form of a substance which met the requirements of this claim, it might be held to infringe. So too if some one, without making use of any suprarenal glands, should chemically combine, CH, C, OH, $CH_2$, NH, and $CH_3$, so as to obtain a synthetic duplicate of the substance called for by this sixth claim, such substance might be held to infringe this claim.

Two important questions then arise: Is there anything in the specifications and prior art which indicates that this claim may be sustained without giving it so broad a construction? Giving it the broad construction, was Takamine's contribution to the art such that he is entitled to make and hold so comprehensive a claim?

Important though these questions are, the answers to them are not at all necessary to the disposition of this suit. Defendant's product, derived as it is from the suprarenal glands, has been already found to be an infringement of several claims, one of them at least (the first) a very broad one which it has been held the patentee was entitled to. If we were hearing the case at circuit, we would be inclined to pass

these claims (6, 13, and 15) with the statement that, in view of what had been already decided, further discussion of individual claims seems unnecessary. We are averse to entering into the investigation necessary to answer the second question, until it is seen whether or not the art is going to produce a substance which has never been associated with suprarenal gland tissue and which nevertheless responds to the requirements of these claims. It may be that no one will ever discover elsewhere in nature the above-described principle contained in the suprarenal glands. It may be that the synthetic duplicate, if produced, will be so deficient in that principle that it would be a waste of time and money to manufacture it.

For these reasons we have concluded to reverse so much of the decree as holds claims 6, 13, and 15 to be valid and infringed; not because upon a study of the record we are of the opinion that Judge Hand erred in so holding, but because we are not now willing to enter into an examination of claims which it is not necessary to pass upon in order fully to dispose of the controversy at bar.

[2] The second patent deals with a salt of the base with which the first patent is concerned. We concur with Judge Hand's reasoning and conclusions as to the various questions presented for discussion, but think there should be a disposition of the claims similar to that already indicated in our discussion of the first patent, confining this decision to the substance now charged to be an infringement. Claims 5 and 6 of the second patent refer expressly to the "herein-described product of the suprarenal glands." These claims are valid and infringed. Claims 1 and 2, however, are susceptible of a broader construction covering a substance in the production of which the suprarenal glands have played no part. We are averse to entering upon any discussion of the questions whether they should be given so broad a construction, and whether in view of the prior art and the general principles of patent law the patentee is entitled to have them thus construed. It is not necessary to do so in order to determine the present suit, and we prefer to postpone such discussion until it be seen whether the necessity for entering upon it will ever arise. We have therefore concluded to reverse so much of the decree in the second suit as holds claims 1 and 2 valid and infringed, not because we are of the opinion that Judge Hand erred in so holding, but for the reasons already stated in connection with the first patent.

The decree in the first suit is affirmed except as to claims 6, 13, and 15, as to which it is reversed without prejudice.

The decree in the second suit is affirmed, except as to claims 1 and 2, as to which it is reversed without prejudice.

Costs of these appeals to the appellee.